UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

SGC ENGINEERING, LLC,          )
                               )
              Plaintiff,       )
                               )
       v.                      )        No. 2:24-cv-00086-JAW
                               )
SCOT A. MACDONALD,             )
                               )
              Defendant.       )

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Applying Texas law, the court dismisses without prejudice a former employer's motion for preliminary injunction against a former employee for an alleged breach of a non-solicitation agreement because the former employer has failed to adduce sufficient evidence that the employee has breached the agreement to justify the exercise of the extraordinary remedy of preliminary injunctive relief pending trial.

## I.   PROCEDURAL HISTORY

On March 20, 2024, SGC Engineering, LLC (SGC) filed a verified complaint against Scot A. MacDonald[1] to enforce the terms of a non-solicitation covenant in a Confidentiality, Invention, and Non-Solicitation Agreement (Agreement).  *Verified Compl. (Inj. Relief Sought)* (ECF No. 1) (*Compl.*).  On the same day, SGC moved for a preliminary injunction to enforce the terms of the Agreement pending the resolution of the litigation. *Mot. for Prelim. Inj.* (ECF No. 4) (*Pl.'s Mot.*).  On April 11, 2024, Mr. MacDonald filed an answer to the complaint, *Answer to Verified Compl. (Inj. Relief*

---

[1]      The Parties use different spellings of the Defendant's surname.  For the purposes of this order, the Court has adopted the spelling "MacDonald" with a capitalized "D," as provided by the Defendant himself in his affidavit, on assumption that Mr. MacDonald knows how to spell his own name.

*Sought) and Affirmative Defenses* (ECF No. 11), and a response to the motion for preliminary injunction. *Obj. to Mot. for Prelim. Inj.* (ECF No. 12) (*Def.'s Opp'n*). On April 25, 2024, SGC filed a reply. *Reply in Support of Prelim. Inj.* (ECF No. 16) (*Pl.'s Reply*). On September 30, 2024, the Court held oral argument on the motion for preliminary injunction. *Min. Entry* (ECF No. 35).

## II.   STATEMENT OF FACTS

### A.   SGC's Verified Complaint

SGC's complaint in this case is verified as true and correct by Jason D. Leadingham, Vice President of SGC. *Compl.* at 10. According to the complaint, SGC is a Delaware limited liability company with a principal place of business in the town of Westbrook, Maine, and its sole member is Magnolia River International, Inc., an Alabama corporation with a principal place of business in the city of Decatur, Alabama. *Id.* ¶ 2. Scot A. MacDonald is a resident of the town of Arundel in the state of Maine. *Id.* ¶ 3. SGC is a multidisciplinary engineering firm serving clients in northeastern and southeastern United States and in Canada; the overwhelming majority of its revenue is derived from its Professional Land Surveying services. *Id.* ¶¶ 7, 9. According to the Plaintiff, on approximately January 9, 2019,[2] SGC hired Mr. MacDonald as a Professional Land Surveyor (PLS) and Registered Professional Land Surveyor (RPLS), whose responsibilities included developing SGC's business relationships and delivering professional services to SGC's clients. *Id.* ¶ 11.

---

[2]      Mr. MacDonald disputes the date of his hiring by SGC in his affidavit. *See infra* Section I.B.

On January 9, 2019, SGC and Mr. MacDonald entered into the Confidentiality, Invention, and Non-Solicitation Agreement, a copy of which SGC attached to the complaint as Exhibit A. *Id.* ¶ 12. The Agreement provided, in relevant part:

> The Employee will not, during the term of his employment with the Company, and for a period of two years immediately following the termination of employment for any reason, directly or indirectly, for himself or on behalf of or in conjunction with any other person, company, partnership, corporation, or business of whatever nature, do any of the following:
>
> (A) Call on any person who is, at that time, an employee of any entity in the LR Group for the purpose of enticing the employee away from or out of the employ of the LR Group entity;
>
> (B) Solicit, induce, or attempt to induce any past or current customer or contractor of an LR Group entity to (a) cease doing business in whole or in part with the LR Group or (b) to do business with any other person or entity that performs services materially similar to or competitive with those the LR Group provides.

*Id.*, Attach. 1, *Confidentiality, Invention, and Non-Solicitation Agreement* ¶ 2.1 (A), (B) (*Agreement*).[3]

Mr. MacDonald resigned his position with SGC effective August 18, 2023. *Id.* ¶ 15. Immediately thereafter, Mr. MacDonald began employment with Patriot Surveying & Infrastructure, PLLC (Patriot), a North Carolina limited liability company with a principal place of business in Mooresville, North Carolina, one of SGC's direct competitors. *Id.* Patriot maintains an office in Arundel, Maine, where

---

[3]      As the quoted language indicates, portions of the Agreement refer to LR Group. *Agreement* at 2-5. The Agreement itself is signed by a representative of SGC. *Id.* at 5. The explanation for the interchangeable use of LR Group and SGC appears in Mr. MacDonald's affidavit. *Def.'s Opp'n*, Attach. 2, *Aff. of Scot A. MacDonald in Support of Obj. to Mot. for Prelim. Inj.* ¶¶ 12, 26, 28. The bottom line is that the parties treat the Agreement as having been entered into between SGC and Mr. MacDonald.

Mr. MacDonald lives. *Id.* ¶ 16. Patriot currently employs Mr. MacDonald as its Senior Vice President. *Id.* ¶ 17.

Both before and after his resignation from SGC, Plaintiff claims, Mr. MacDonald violated his promise not to solicit SGC employees. *Id.* ¶ 18. At least four SGC employees who previously reported directly to Mr. MacDonald have, as a result of his violations of the Agreement, resigned from SGC and begun work for Mr. MacDonald at Patriot. *Id.* ¶ 19. The four employees, each a significant member of SGC's team and vital to its existing and new projects, included Maurice Clark, Connor Hill, Matt Plante, and Andrew Strout. *Id.* ¶¶ 19-24. Before his resignation, Mr. MacDonald sent the president of Patriot the LinkedIn profile of SGC employee Ussel Campbell, and Mr. Campbell resigned his position at SGC effective September 12, 2023. *Id.* ¶ 25. As of March 20, 2024, Patriot and MacDonald have hired more than ten former SGC employees; the six others include Michael High, Kevin Humble, Travis Chafee, Asa Rose, Colin Pope, and Jason Smith. *Id.* ¶ 26. The loss of Mr. MacDonald and the ten other SGC employees has had a deleterious effect on SGC's ability to service its current clients and to attract new ones. *Id.* ¶ 27. SGC reports Mr. MacDonald's breaches of the Agreement are ongoing. *Id.* ¶¶ 33-35.

SGC attached to the complaint a copy of the Agreement and a copy of the email from Mr. MacDonald to the president of Patriot regarding Mr. Campbell's LinkedIn profile. *Id.*, Attach. 1, *Agreement*; Attach. 2, *Email from Scot MacDonald to Eric Cooke* (Aug. 17, 2023) (*LinkedIn Email*).

### B.   Scot MacDonald's Affidavit

Scot MacDonald attached his affidavit to his opposition to the motion for preliminary injunction. *Def.'s Opp'n*, Attach. 2, *Aff. of Scot A. MacDonald in Support of Obj. to Mot. for Prelim. Inj.* (*MacDonald Aff.*) at 1-4.   Mr. MacDonald affirms that he was a Professional Land Surveyor who was originally hired by SGC as a Survey Group Manager in 2005.   *Id.* ¶¶ 2-3.   Mr. MacDonald worked for SGC for approximately seventeen years, during which time his role expanded to include business development and project management. *Id.* ¶¶ 4-5.

Mr. MacDonald mentions Eric Cooke, who he describes as a "longtime coworker and colleague." *Id.* ¶ 6.   Mr. Cooke was one of the founders of SGC in 2000 and left SGC in 2004 to work in the civil construction industry, where he worked for ten years. *Id.* ¶¶ 7-8.   Mr. Cooke returned to SGC in 2014, and Mr. MacDonald and Mr. Cooke worked there together from 2014 through 2017. *Id.* ¶ 9.   In 2017, Mr. MacDonald and Mr. Cooke disagreed with upper management about SGC's direction, and in 2017, both Mr. Cooke and Mr. MacDonald left SGC to work for one of its competitors. *Id.* ¶ 10-11.

In 2018, a company called Lloyd's Register Group (LR Group) purchased SGC. *Id.* ¶ 12.   After LR Group acquired SGC, there was a management shakeup, and on or around Labor Day, 2018, Mr. Cooke rejoined SGC as did Mr. MacDonald. *Id.* ¶¶ 13-16.   When Mr. Cooke and Mr. MacDonald returned to SGC, it had one office and about forty employees, and over the years, Mr. Cooke and Mr. MacDonald built SGC to a seven-office business with over 325 employees. *Id.* ¶ 17.

In late 2018 or early 2019, LR Group produced a non-solicitation agreement that it wanted all SGC employees to sign. *Id.* ¶ 18. Many employees, including many in senior management, refused to sign the agreement. *Id.* ¶ 19. Mr. MacDonald's office was located directly across from Human Resources and next to the then Vice President of SGC, *id.* ¶ 20, and they "incessant[ly] hound[ed]" him to sign the Agreement. *Id.* ¶ 21. Mr. MacDonald signed the Agreement. *Id.* But, before signing, he made handwritten amendments which provided that he could "maintain contact with clients [he] had developed and/or clients that might be engaged with any future employer of [his]." *Id.* ¶ 22. Mr. MacDonald says that he did not keep a copy of the Agreement with his handwritten amendments, but that the Agreement attached to SGC's complaint is not a copy of what he signed. *Id.* ¶¶ 23-25.

In 2019 or 2020, SGC was sold to a British venture capital group called Vysus Group. *Id.* ¶ 26. In early 2022, a core group of SGC employees, including Mr. MacDonald, offered to buy SGC from Vysus. *Id.* ¶ 27. But, around April 2022, Vysus sold SGC to Magnolia River International (MRI), and the sale went through in October 2022. *Id.* ¶¶ 28-29. Almost immediately, MRI instituted a new management style without an understanding of or interest in the SGC culture. *Id.* ¶ 30. MRI imposed new policies that left many SGC employees unhappy. *Id.* ¶¶ 31-32.

Mr. Cooke left SGC in April 2023 and started a company called Patriot Surveying and Infrastructure, LLC (Patriot). *Id.* ¶ 33. After much deliberation, Mr. MacDonald decided to leave SGC and join Patriot, and he resigned from SGC in August 2023. *Id.* ¶ 34. When he spoke to SGC project managers, he stressed to them

that they should remain at SGC, that the management issues would dissipate over time, and that they had plenty of work and support for their projects. *Id.* ¶ 35. Mr. MacDonald assisted Patriot with some work after he left SGC, but he did not join Patriot until January 1, 2024. *Id.* ¶ 36. Mr. MacDonald has no ownership interest in Patriot. *Id.* ¶ 37. Mr. MacDonald says that he has not "solicited, interviewed, negotiated with, or hired any former SGC employees who now work for Patriot." *Id.* ¶ 38. The list of employees includes Maurice Clark, Connor Hill, Matt Plante, Andrew Strout, Michael High, Kevin Humble, Travis Chafee, Asa Rose, Colin Pope, and Jason Smith. *Id.* Mr. MacDonald says that he has at all times adhered to the terms of the non-solicitation agreement. *Id.* ¶ 39.

## III.   THE PARTIES' POSITIONS

### A.   SGC's Motion for Preliminary Injunction

After reviewing the legal standards for judicial assessment of a motion for preliminary injunction, *Pl.'s Mot.* at 4-5, SGC contends that, under the terms of the Agreement, state of Texas substantive law applies to this breach of contract case. *Id.* at 5 (citing *Agreement* ¶ 10). Quoting Texas law, SGC says that, to prove a claim for breach of contract, a plaintiff must establish: "(1) the existence of a contract, (2) breach of the contract by the defendant, (3) damages to the plaintiff resulting from that breach." *Id.* (quoting *Velvet Snout, LLC v. Sharp*, 441 S.W.3d 448, 451 (Tex. App.—El Paso 2014, no pet.)). SGC avers that in Texas, non-solicitation agreements are treated like covenant not to compete agreements. *Id.* at 6 (collecting caselaw).

SGC quotes Texas statutory law on covenants not to compete, saying that a non-solicitation agreement is enforceable if:

> it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promises.

*Id.* (quoting TEX. BUS. AND COM. CODE 15.50(a)). SGC reviews caselaw interpreting this statutory provision and concludes that SGC will likely prevail on the merits because "SGC bargained to ensure that MacDonald would not poach its newly acquired employees in an industry where competition for talent is tight." *Id.* at 6-8.

SCG next argues that it will suffer irreparable harm because "legal remedies (i.e. monetary damages) are inadequate." *Id.* at 8. Quoting Texas caselaw, it contends that "injury from the breach of a non-compete is the epitome of irreparable injury." *Id.* at 9 (quoting *Miner Ltd v. Anguiano*, 383 F. Supp. 3d 692, 696 (W.D. Tx. 2019)). SGC maintains that Mr. MacDonald was "privy to, and took advantage of, SGC's business goodwill and confidential information." *Id.* at 7. After reviewing the other factors for the issuance of a preliminary injunction, SGC urges the Court to issue an injunction to "enjoin MacDonald from soliciting, in any manner, any employee of SGC as provided in the Agreement." *Id.* at 11.

## B.   Scot MacDonald's Opposition

After reviewing the legal standards to issue a preliminary injunction, Mr. MacDonald first asserts that SGC's motion must fail due to a lack of new consideration for the Agreement. *Def.'s Opp'n* at 5-7. Mr. MacDonald describes the

Agreement as a "standalone promise lacking any consideration" and, citing Texas caselaw, argues that such agreements without new consideration are unenforceable. *Id.* at 6.

Furthermore, he maintains that he received no confidential information as a consequence of signing the Agreement, noting that he had been employed by SGC for fourteen years and already knew much about its inner workings. *Id.* at 6-7.

Next, Mr. MacDonald says he did not breach the Agreement, and without a breach, there can be no viable cause of action for a breach. *Id.* at 7.

Mr. MacDonald admits, however, that to the extent the Court deems the Agreement enforceable, he is "bound by the Agreement's terms," conceding that the Agreement itself is "reasonable in scope and duration." *Id.* at 7. In fact, as his affidavit confirms, Mr. MacDonald maintains that he has acted as if the Agreement is enforceable and has not violated its terms. *Id.*; *MacDonald Aff.* ¶ 39.

Mr. MacDonald points out that SGC concedes that the Agreement requires that he engage in "some *affirmative and intentional act*" in soliciting its employees within two years of his leaving. *Id.* at 8 (emphasis in *Def.'s Opp'n*). Mr. MacDonald challenges SGC to produce any evidence that he has engaged in such acts other than the LinkedIn email, which he claims merely pointed out a "humorous misspelling" and never led to a discussion of or actual employment of Mr. Campbell by Patriot. *Id.* Mr. MacDonald notes that among the former SGC employees who left and joined Patriot, he was the only one who signed a non-solicitation agreement and, therefore,

the other former SGC employees now employed by Patriot were free to recruit current SGC employees to join Patriot. *Id.*

Although Mr. MacDonald agrees that the requested injunction will have no impact on him because it would only prevent him from doing what he is not doing anyway, he argues that the Court should not issue the injunction because it violates the public interest. *Id.* at 9. Mr. MacDonald says that the real reason for the requested injunction is to chill other SGC employees from leaving the company of their own accord and, therefore, granting an injunction would be against the public interest. *Id.*

### C. SGC's Reply

SGC dismisses Mr. MacDonald's consideration argument by noting that the Agreement provided he would prospectively receive "[b]usiness goodwill, confidential or proprietary information, trade secrets, customer information, and specialized training," and saying that this information is worthy of protection under Texas law. *Id.* at 2. Indeed, SGC argues, Texas law upholds agreements where employers agree to provide employees with confidential information in exchange for their agreement not to disclose it. *Id.* (citing *Anguiano*, 383 F. Supp. 3d at 696). SGC identifies the allegedly missing consideration as the information itself that it would provide Mr. MacDonald in the future as he maintained employment there. *Id.* at 2-3. SGC highlights Mr. MacDonald's concession that the terms of the Agreement are reasonable and again cites Texas caselaw to emphasize that this factor is the most important factor to determine a non-solicitation covenant's enforceability. *Id.* at 3-4.

Contrary to Mr. MacDonald's assertions, SGC insists that he has acted to break the Agreement by soliciting former SGC employees, whether directly or indirectly. *Id.* at 4-5.

SGC contends that Mr. MacDonald has waived any argument on the remaining three injunction factors—irreparable harm, balance of the equities, and effect of an injunction on the public interest—by failing to substantively address them. *Id.* at 5. SGC says that absent an injunction, it stands to lose more employees to Patriot, which will in turn harm its reputation in a niche industry. *Id.* By contrast, SGC argues that granting the injunction would have no impact on Mr. MacDonald, since he says he is complying with the terms of the Agreement anyway. *Id.*

## IV.  LEGAL STANDARD

### A.  Standard for a Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy that is never awarded as of right." *Peoples Fed. Sav. Bank v. People's United Bank*, 672 F.3d 1, 8-9 (1st Cir. 2012) (quoting *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011)).  To determine whether to issue a preliminary injunction, a court must analyze four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

*Esso Standard Oil Co. (P.R.) v. Monroig-Zayas*, 445 F.3d 13, 17-18 (1st Cir. 2006) (alteration in original) (quoting *Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st

Cir. 2004)).   "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor."  *Id.* at 18 (citing *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003)).  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

"The sine qua non of this four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002); *see also Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 7 (1st Cir. 2012) (confirming that this factor is "the most important part of the preliminary injunction assessment" (quoting *Jean v. Mass. State Police*, 492 F.3d 24, 27 (1st Cir. 2008)).

Irreparable harm is "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005).  For the Court to grant the motion for preliminary injunction, SGC must "demonstrate that irreparable injury is *likely* in the absence of an injunction," not merely that it is a possibility.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original); *see also Canadian Nat'l Ry. Co. v. Montreal, Me. & Atl. Ry., Inc.*, 786 F. Supp. 2d 398, 432 (D. Me. 2011) ("[P]roof of a mere possibility of injury is insufficient to justify an injunction").  Courts "measure irreparable harm on 'a sliding scale, working in conjunction with a moving party's

likelihood of success on the merits.'" *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (quoting *Vaqueriá Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 485 (1st Cir. 2009)). Thus, "[t]he strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown;" however, "at least some positive showing of irreparable harm must still be made." *Id.* at 43 (internal quotation omitted) (alteration in original); *see also Gately v. Commonwealth of Mass.*, 2 F.3d 1221, 1232 (1st Cir. 1993) ("[A] federal court cannot dispense with the irreparable harm requirement in affording injunctive relief").

The First Circuit has termed the third factor the "balance of relevant impositions," assessing "the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues." *Monroig-Zayas*, 445 F.3d at 18 (quoting *Bl(a)ck Tea Soc'y*, 378 F.3d at 11) (internal quotations omitted). The Court must weigh the balance of equities to determine whether the injury to the plaintiff in the absence of a preliminary injunction outweighs any harm to the defendant if granted.

The final factor is the public interest. This factor requires the Court to "inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief." *Everett J. Prescott, Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24.

## V.     DISCUSSION

### A.     Standard for Evaluation of a Covenant Against the Solicitation of Employees

The language in the Agreement restricting Mr. MacDonald's actions in the event of his departure is in subsection 2 and reads:

**2. <u>Non-solicitation Agreement:</u>**

2.1  Employee recognizes that the Company's offer of employment and willingness to provide Employee with Confidential Information and to enter into this Agreement is based in material part on Employee's agreement to the provisions of this Article 2 and that the Employee's breach of the provisions of this Article 2 could materially damage the LR Group.  Subject to the further provisions of this Agreement, and in consideration of the Company's agreement to employ Employee, Employee will not, during the term of his employment with the Company, and for a period of two years immediately following the termination of employment for any reason, directly or indirectly, for himself or on behalf of or in conjunction with any other person, company, partnership, corporation, or business of whatever nature do any of the following:

  (A)  Call on any person who is, at that time, an employee of any entity in the LR Group for the purpose or with the intent of enticing the employee away from or out of the employ of the LR Group entity;

  (B)  Solicit, induce, or attempt to induce any part or current customer or contractor of an LR Group entity to (a) cease doing business in whole or in part with the LR Group or (b) to do business with any other person or entity that performs services materially similar to or competitive with those the LR Group provides.

2.2.  Because the Company would fine it difficult to measure economic losses resulting from a breach of the covenant not to solicit or of the confidentiality agreement set forth in this Agreement and because the Company or the LR Group would suffer immediate and irreparable damage for which it would have no other adequate remedy, the Company may enforce the

> covenant not to solicit and the confidentiality objection against Employee by injunctions and restraining orders.   Employee waives any requirement that the Company secures or post any bond in connection with these remedies.

*Agreement* ¶¶ 2.1, 2.2.

Thus, the Agreement's restriction contains two parts: (1) a covenant not to compete for SGC's customers, and (2) a covenant not to solicit SGC's employees. SGC's motion for preliminary injunction addresses only the second part, asking the Court to "enjoin MacDonald from soliciting, in any manner, any employee of SGC as provided in the Agreement." *Pl.'s Mot.* at 11.   Accordingly, the Court determines the standard applicable for evaluation of a covenant not to solicit employees.   As the Agreement uses "solicitation" to refer to both non-solicitation of clients and non-solicitation of employees, there is an inherent ambiguity as to which provision is being referenced.   For clarity, the Court uses "non-recruitment" to refer to the Agreement's prohibition against soliciting SGC employees.

In the plaintiff's motion for preliminary injunction and the defendant's opposition, both parties cite TEX. BUS. & COM. CODE § 15.50(a) as the standard to be applied to the non-solicitation agreement as a whole. *Pl.'s Mot.* at 6; *Def.'s Opp'n* at 6.   As recited by the parties, Texas statutory law provides, "[e]very contract . . . in restraint of trade or commerce is unlawful." TEX. BUS. & COM. CODE § 15.05(a).   Thus, as a general matter, "[c]ovenants not to compete are generally considered restraints of trade and are disfavored in law." *Shoreline Gas, Inc. v. McGaughey*, No. 13-07-364-CV, 2008 Tex. App. LEXIS 2760, at *12 (Tex. App.—Corpus Christi-Edinburg Apr.

17, 2008, no pet.).  Section 15.50(a) offers a carveout to this general rule for covenants not to compete, permissible under narrow conditions:

> [A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com. Code § 15.50(a).

The parties' reliance on § 15.50(a) and *Shoreline Gas*, however, fails to engage with the distinction between a covenant against solicitation of clients and a covenant against recruitment of employees.  The *Shoreline Gas* Court jointly addressed solicitation of accounts and employees in its analysis*, Shoreline Gas, Inc.*, 2008 Tex. App. LEXIS 2760, at *25-28, but other Texas caselaw confronts this question on all fours, oftentimes referring to solicitation of employees instead as "non-recruitment" agreements.  In doing so, these Texas courts have held that, although covenants not to compete fall within § 15.50, "covenants against solicitation [of employees] in the individual defendants' agreements with [the former employer] are not governed by § 15.50. . .." *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs.*, No. SA-03-CA-0305-FB, 2005 U.S. Dist. LEXIS 42781, at *7 (W.D. Tx. Sept. 28, 2005).

In the magistrate judge's recommended decision in *Nova Consulting*, she thoroughly explored Texas law on this issue and concluded that covenants against solicitation of employees do not constitute "restraints on trade in violation of § 15.50," and therefore, "the exception afforded by § 15.50 for noncompete covenants is not applicable." *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs.*, 2005 U.S. Dist.

16

LEXIS 46925, at *71-72 (W.D. Tx. June 3, 2005), *aff'd* 2005 U.S. Dist. LEXIS 42781 (W.D. Tx. Sept. 28, 2005).[4]  In part, the magistrate judge's recommendation drew from an analysis of the issue in *Totino v. Alexander & Associates*, in which the First Court of Appeals of Texas for the First District in Houston explained that a nonrecruitment agreement is not a restraint on trade because it does not "prevent the former employee from exercising his trade, profession, or business."   *Totino v. Alexander & Assocs.*, No. 01-97-01204-CV, 1998 Tex. App. LEXIS 5295, at *29 (Tex. App.—Houston 1st Dist. Aug. 20, 1998, no pet.).   In fact, "the nonrecruitment agreement *assumed* the former employee would compete; it merely restricted those whom he could recruit for his new company." *Id.* (emphasis in original).

The *Totino* Court relied on *Smith, Barney, Harris Upham & Co. v. Robinson*, 12 F.3d 515 (5th Cir. 1994), a Fifth Circuit case interpreting an analogous statute in Louisiana.  In *Smith Barney*, the Fifth Circuit addressed a non-recruitment provision involving a stockbroker and concluded that the non-recruitment provision "did not restrain [the stockbroker] from exercising a lawful profession, trade or business." *Id.* at 519.  To the contrary, "the Agreement *assumes* that [the stockbroker] will exercise his profession, presumably even as a branch manager, with a competitor firm.  [The stockbroker] is free to recruit stockbrokers or employees for [his new employer]-- anywhere, any time, and from any organization--save only that small class

---

[4]      After affirming the magistrate judge's recommended decision on this issue, the district court denied a request for an interlocutory appeal of this question.  *Nova Consulting*, 2006 U.S. Dist. LEXIS 108690, at *1-9 (W.D. Tx. Jan. 31, 2006).   The district judge wrote that "although Texas law is unsettled and the issue of whether a nonrecruitment contract restrains trade appears to be novel in the court of the Fifth Circuit, the decision in this case, that the nonrecruitment covenant at issue does not fall within the scope of § 15.50, was not reached in a manner contrary to the federal cases cited by defendants." *Id.* at *8.

comprising Smith Barney's employees, a class which he willingly agreed not to solicit." *Id.* (emphasis in original). Following this line of Texas caselaw, the Court concludes that, while Mr. MacDonald's agreement not to compete with SGC for its customers is covered by § 15.50, this standard is inapposite to his agreement not to recruit SGC employees because the latter does not constitute a restriction on trade.

The United States District Court in Texas described the impact of this conclusion on evaluation of a non-recruitment agreement:

> The conclusion that covenants against solicitation in the individual defendants' agreements with [the former employer] are not governed by § 15.50 . . . precludes the determination of the reasonableness of the restrictions as a matter of law and requires [the former employer's] claim that defendants breached the covenants against solicitation be submitted to the finder of fact, along with the other issues for which factual disputes preclude entry of summary judgment.

*Nova Consulting Grp., Inc. v. Eng'g Consulting Servs.*, No. SA-03-CA-0305-FB, 2005 U.S. Dist. LEXIS 42781, at *7 (W.D. Tx. Sept. 28, 2005).

In other words, for purposes of analyzing the non-recruitment provision, the Court treats the case as a standard breach of contract claim and does not analyze it under the more restrictive inquiries provided in § 15.50.

Under Texas state law, a breach of contract claim consists of four elements:

> (1) a valid contract exists; (2) performance or tendered performance by the plaintiff; (3) defendant breached the contract; and (4) plaintiff suffered damages as a result of plaintiff's breach.

*Mesquite Servs., LLC v. Standard E&S, LLC*, 610 S.W.3d 548, 560 (Tex. App.—Amarillo 2020, pet. denied). "For a contract to exist, there must be an offer, acceptance, and consideration." *Burges v. Mosley*, 304 S.W.3d 623, 629 (Tex. App.—Tyler 2010, no pet.) (citing *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—

Amarillo 2008, pet. denied)).   With this in mind, the Court turns to consider whether SGC has pleaded adequate facts for the Court to find it likely that the actions of Mr. MacDonald constituted a breach of a valid contract.

### B.   Evaluating the Non-Recruitment Provision under the Breach of Contract Standard

#### 1.   A Lack of Evidence of Breach

Here, the Court resolves the request for preliminary injunction on whether SGC has established a likelihood that Mr. MacDonald engaged in any conduct that breached the terms of the contract.   The Court concludes that, based on the facts in the record, SGC has failed to meet its burden on this element. Thus, it need not consider the other elements of a breach of contract claim.

In short, SGC has alleged that several of its employees left its employ and later joined Patriot.   It attributes this switch to recruitment by Mr. MacDonald.   But Mr. MacDonald has denied breaching the non-recruitment provision of the Agreement.

Where the parties disagree on fundamental facts, the Court looks to the record to determine whether the party bearing the burden of proof has sustained its obligation to demonstrate it is entitled to its requested relief.   *Monroig-Zayas*, 445 F.3d at 18.   Here, SGC's evidence establishes that several SGC employees, some under Mr. MacDonald's direction while he was at SGC, left SGC and joined Patriot. The hole in SGC's proof, however, is that Mr. MacDonald was the only SGC employee who signed the Agreement and other Patriot employees, including Mr. Cooke, the founder and owner of Patriot, were not bound to avoid recruiting SGC employees.

The Court could draw an inference that Mr. MacDonald was the person at Patriot who recruited the SGC employees who left SGC and joined Patriot, but it could just as easily infer that they left due to Mr. Cooke's efforts, the efforts of other former SGC employees not bound by the recruitment restriction, or of their own volition. Given this equipoise, the Court studied the record to determine whether SGC provided any direct proof of Mr. MacDonald's recruitment of SGC employees in violation of the Agreement.

The only direct proof submitted by SGC is an email Mr. MacDonald sent Mr. Cooke on August 17, 2023 with Ussel Campbell's LinkedIn profile. *LinkedIn Email* at 1. The MacDonald email attached Mr. Campbell's LinkedIn profile, which misspelled surveyor as "serveyor." *Id.* In Mr. MacDonald's email to Mr. Cooke, he wrote: "Is you a surveyor?" *Id.* Mr. MacDonald explains this interchange as pointing out to Mr. Cooke Mr. Campbell's "humorous misspelling in his LinkedIn profile of 'surveyor' as 'serveyor.'" *Def.'s Opp'n* at 8.

The Court does not view the LinkedIn email as carrying much evidentiary weight. The problem is that there is no allegation that Mr. Campbell joined Patriot, and at oral argument, SGC confirmed that in fact Mr. Campbell did not join Patriot. Evidence that on August 17, 2023, Mr. MacDonald sent Mr. Cooke an email containing Mr. Campbell's LinkedIn profile and that Mr. Campbell resigned his employment with SCG on September 12, 2023, *Compl.* ¶ 25, without later joining Patriot, leaves the LinkedIn email unconnected to the gravamen of SGC's lawsuit or

its allegations that Mr. MacDonald acted in violation of the non-recruitment provision. The LinkedIn email instead becomes a random, untethered fact.

Further, without more, the Court credits Mr. MacDonald's contention that his email to Mr. Cooke was intended to point out Mr. Campbell's misspelling of the word surveyor and was not a recruitment suggestion. This finding is buttressed by the fact that in his email, Mr. MacDonald (presumably deliberately) used a singular verb with a second person and grammatically plural pronoun: "is you." This language does not indicate the email represented an attempted or suggested recruitment of Mr. Campbell to Patriot.

Without the email, SGC has produced no direct evidence to support its allegation that Mr. MacDonald breached the Agreement, and its case melts to only an inference, permissible, but unconvincing, in light of an at least equally permissible and more likely inference that Mr. Macdonald committed no breach. To conclude that SGC is entitled to the extraordinary remedy of a preliminary injunction, in the face of Mr. MacDonald's denial, the Court requires stronger, more convincing proof that Mr. MacDonald was actively breaching the Agreement, either directly or indirectly, than SGC has mustered in this record.

Nor does SGC's allegation make much practical sense. The founder and owner of Patriot is Eric Cooke. SGC has not alleged that Mr. Cooke signed a non-recruitment agreement with SGC; thus, Mr. Cooke would have been free to contact any SGC employee and attempt to recruit them to join Patriot. Nor is there any evidence in the record as to who (if anyone) among the other former SGC employees

was bound by a non-recruitment agreement.  The one person at Patriot who may have been restricted against recruiting SGC employees was Mr. MacDonald, and it thus makes no practical sense, given the other unrestricted Patriot employees, for Mr. MacDonald to have run the risk of a SGC lawsuit when others could have acted with impunity.

In short, when analyzed, SGC's complaint on Mr. MacDonald's breach of the non-solicitation agreement is long on accusation but short on detail, and the Court declines to exercise its equitable authority to issue an injunction on such slim evidence.

## VI.   SUMMARY

The Court is not persuaded based on this record that SGC has adduced sufficient facts to justify the issuance of a preliminary injunction.  In making this determination, the Court stresses that it is limited by the record before it and its conclusions are not a prediction about the future course of this case.  Discovery may well confirm SGC's suspicions that Mr. MacDonald was directly or indirectly involved in recruitment more than he has admitted.  If so, it will be a different case than the one SGC has presented thus far.

As the Texas Appeals Court has written, "[t]he purpose of a [preliminary] injunction is to preserve the status quo of the litigation's subject matter pending trial on the merits." *Shoreline Gas*, 2008 Tex. App. LEXIS 2760, at *7-8.  In *Shoreline Gas*, the appeals court observed that the employer had produced "no evidence that [the former employee] had actually breached or violated any covenant or undertaking

contained in the Agreement, or even that [the employee] had threatened to breach or violate any such undertakings." *Id.* at *34. The appeals court concluded that the record only revealed that the former employer "had a fear or apprehension of the possibility of injury" and this was "insufficient to establish a probability of irreparable injury as would support a temporary injunction." *Id.* at *36.

The Court concludes that SGC has failed in its burden to demonstrate it is entitled to a preliminary injunction and dismisses its motion without prejudice.

## VII.   CONCLUSION

The Court DISMISSES without prejudice SGC Engineering, LLC's Motion for Preliminary Injunction (ECF No. 4).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 8th day of October, 2024